## Thomas J. O'Callaghan, Appellee, v. Dellwood Park Company, Appellant.

### Gen. No. 5,117.

1. PASSENGER AND CARRIER—*who subject to liability of latter.* A company owning an amusement park and operating a scenic railway is subject, when it has accepted passengers upon such railway for hire, to the liabilities of carriers of passengers generally.

2. PLEADING—*what averment of declaration may be treated as surplusage.* If a declaration sets up facts from which the law implies the duty of the defendant to exercise the highest degree of care, a statement in such declaration that it was the duty of such defendant to exercise ordinary care may be treated as surplusage.

3. PLEADING—*what proof sufficient to sustain declaration, in action on the case.* The plaintiff in a declaration filed in an action of case need not prove each and every allegation but fulfills his legal burden if he proves enough of such allegations to establish a cause of action.

4. VERDICT—*when not excessive.* *Held,* in an action on the case for personal injuries, that a verdict for $1,200 was not excessive where it appeared that the plaintiff at the time of the accident was 25 years of age, was earning $2.65 per day, that his face and mouth were seriously injured, that he was unable to work for 13 weeks and bears permanent scars upon his face, etc.

Action in case for personal injuries. Appeal from the Circuit Court of Will county; the Hon. A. O. MARSHALL, Judge, presiding. Heard in this court at the October term, 1908. Affirmed. Opinion filed March 24, 1909.

**Statement by the Court.** Appellant operates an amusement park at grounds located between the cities of Joliet and Lockport in Will county. It has therein what is called a scenic railway. Appellee was injured while riding upon said scenic railway, and brought this action against appellant to recover damages for said injuries. He had a verdict for $1,600, was required to remit $400 and had a judgment for $1,200, from which defendant below prosecutes this appeal.

The cars upon the scenic railway were shaped somewhat like a cutter or sleigh, and had two seats, each capable of holding two adults or three children. The back of each seat was high, and the back of the front seat therefore furnished a protection to the persons riding on the back seat. For the protection of the persons riding on the front seat there was an iron bar turning upon a swivel, which was lifted up to permit persons to take their places on the front seat and was then drawn down in front of them before the car started. It came about waist high to a passenger when seated, and could be taken hold of by the passenger to protect him during the ride. There were four wheels under each car, flat and without a flange, which ran upon a maple rail laid upon another timber and rested on cross ties. There were like timbers and maple rails on each side of the track, and two flat wheels on each side of the car which played against these maple rails. A part of the way the railway ran upon trestle work elevated considerably above the ground. Passengers entered the cars at a platform on the upper edge of a valley, which platform was some forty-two feet above the lowest point in the tracks. After the passengers were seated the car was started by hand and was then propelled by an endless chain up an incline, and was then released from the endless chain and dropped fifteen feet down a sharp incline, and thereby gained the principal momentum for the trip. Several times during its course the track went up over a small artificial hill and then dropped again. The course of the road

was circuitous and contained numerous curves, and passed through and by attractive natural scenery. The cars reached the foot of the incline almost directly below the starting place. The cars were then drawn by an endless chain up an incline to the starting platform just referred to. When the car had nearly reached the foot of the portion of the road traveled by the force of gravity there were two appliances, called brakes, in the road bed some distance apart, at each of which a man was stationed to so elevate the track in front of the car as to check its speed, the second brake being intended to reduce the speed so that the car could be readily caught by the endless chain and carried up from the bottom of the valley. The entire length of this railway, following the dips in the track, was 1,970 feet. The distance in which the car was propelled by gravity was about 1,600 feet and that distance was generally traversed by the car in three-fourths of a minute or a minute. The car was not accompanied by any person in charge of it.

On September 25, 1906, somewhere about 9 P. M., appellee and William Kirby paid five cents each, the regular fare for a ride around this railway, and took their places in the front seat of a car, and after they were seated the handle bar in front was drawn down over their laps and the car started. After it had gone down the first declivity the car came to a sharp curve at a place five or six feet above the ground. They both testified that the car was suddenly checked. Kirby testified that the car was just barely moving, and then testified that it was stopped. Appellee testified that it stopped, but afterwards testified that he did not know whether it stopped or not. Kirby testified that a grinding sound was heard underneath, as if they were passing over stone or gravel. Appellee testified that there was a grinding noise, as if something was hanging from the side or bottom of the car. Appellee sat on the left hand side, which was the outside of the curve, and had hold of the handle bar with his left

hand. When the speed of the car was thus suddenly checked while upon the curve, Kirby was pitched forward over the handle bar, and appellee was thrown out of the car and fell upon stones underneath. The car immediately resumed its motion and went on with Kirby in it. When he reached the second brake at the bottom of the incline, he got out and went across to the place where appellee fell out and found him lying on the stones there, seriously hurt about the face and mouth, and bleeding. Kirby testified that appellee was conscious, but appellee testified that he did not regain consciousness until he was in a hospital two or three hours later. An employe of defendant, who went with Kirby to the place where appellee was found, testified for appellant that appellee was unconscious. Although portions of the park were lighted by electricity, the place where this accident happened was in darkness, and there were no eye witnesses to the occurrence, except Kirby and appellee. Appellant's employes testified that each of the cars had been inspected on the morning of that day and were then in good order; that half an hour after this accident this car was taken out of service and inspected and nothing found wrong with it; and that the next morning the track was inspected at the curve and nothing wrong was found there.

E. MEERS, for appellant.

J. W. D'ARCY, for appellee.

MR. JUSTICE DIBELL delivered the opinion of the court.

At the request of appellee the court gave two instructions to the effect that it was the duty of a company operating such a railway to exercise the highest degree of care and caution for the safety of its passengers consistent with the practical operation of the railway, and to do all that human care, vigilance and fore-

sight could reasonably do, consistently with the character and mode of conveyance adopted and the practical prosecution of the business, to prevent accidents to passengers while riding upon its cars. One of these instructions was not technically correct, but it did not direct a verdict, and no point is made here upon any technical inaccuracy. These instructions placed upon appellant the obligations which the law imposes upon common carriers of passengers for hire, and the principal question in the case is whether appellant is subject to that measure of liability. So far as we are advised this is an open question in this State. The vehicle in which appellant's passengers rode was a car running upon wheels placed upon rails. The inspection and control of all the appliances were solely in appellant and its servants. The persons riding in the car could do nothing to guide, control or stop it. They were entirely at the mercy of the appliances appellant had provided. It carries these passengers for hire. It made but a single stop, and the passengers rode for pleasure only, and not upon business. We see no reason why the latter circumstance should affect the rule of liability. We see no good reason why the same underlying principles which bring the operator of a passenger elevator in a building within the rule of liability applied to the common carrier of passengers should not bring those operating these cars upon this scenic railway within the same rule of liability. In Hartford Deposit Co. v. Sollitt, 172 Ill. 222, the court said: "Persons operating elevators are carriers of passengers, and the same rules applicable to other carriers of passengers are applicable to those operating elevators for raising and lowering persons from one floor to another in buildings. It is a duty of such carriers of passengers to use extraordinary care in and about the operation of such elevators, so as to prevent injury to persons therein. The fact of the falling of the elevator is evidence tending to show want of care in its management by the operator or its servants,

or that the same was out of repair or faultily constructed.'' The same doctrine is announced in Springer v. Ford, 189 Ill. 430; Chicago Exchange Bldg. Co. v. Nelson, 197 Ill. 334; and Beidler v. Branshaw, 200 Ill. 425. In Springer v. Ford, *supra,* the court quotes with approval from Treadwell v. Whittier, 80 Cal. 575, as follows: ''Persons who are lifted by elevators are subjected to great risks of life and limb. They are hoisted vertically and are unable, in the case of the breaking of the machinery, to help themselves. The persons running such elevator must be held to undertake to raise such persons safely, as far as human care and foresight will go. The law holds him to the utmost care and diligence of very cautious persons, and responsible for the slightest neglect. Such responsibility attached to all persons engaged in employments where human beings submit their bodies to their control, by which their lives or limbs are put at hazard or where such employment is attended with danger to life or limb. The utmost care and diligence must be used by persons engaged in such employments to avoid injury to those they carry. The care and diligence required is proportioned to the danger to the persons carried. In proportion to the degree of danger to others must be the care and diligence to be exercised. Where the danger is great the utmost care and diligence must be employed. In such cases the law requires extraordinary care and diligence.'' Much of this language is applicable to passengers riding in cars upon appellant's scenic railway. From the very nature of the means of conveyance adopted passengers thereon are subjected to great risks to life and limb. The sudden falls and sharp curves and great speed are sources of peril. The passengers are unable to help themselves in case of any break or displacement of any part of the car, or of the rails or timbers upon which it rests, or of the rails or timbers at its sides which form the channel or trough which guides and controls its course. The passengers who enter these vehicles

and start upon this journey submit their bodies to the control of the appliances which appellant has constructed. They put their lives and limbs at hazard upon a journey which appellant has made attractive in order to induce them to take and pay for the trip. No agent of appellant goes with the car, and it is therefore all the more incumbent upon appellant to exercise the utmost vigilance that there shall be no defect either in the car or in the artificial route to be traversed. While those who ride in elevators do not pay, the patrons of this scenic railway are passengers for hire. Operators of elevators are equally subject to this stringent rule of liability whether those who ride are engaged in real business with some occupant of the building or are going up or down from motives of mere curiosity. Why should the motives of those who ride upon this scenic railway relieve the operator from the duty to carry these paying passengers safely, so far as human care and foresight can do so, consistently with the mode of conveyance adopted, and the practical prosecution of the business? We conclude appellant is responsible as a common carrier. Since this opinion was first written appellant has furnished us with a copy of an opinion rendered in January, 1909, by the Supreme Court of New York, appellate division, in Lumsden v. L. A. Thompson Scenic Railway Co., relating to an accident upon a similar railway. We do not think that case in point, for there, under the proof, there was nothing unusual or extraordinary about the motion of the car, and there was no evidence that anything happened upon the trip when the plaintiff was injured which was not the usual occurrence made necessary by the motion of the car.

It follows, therefore, that after evidence had been introduced showing that appellee had paid his fare and was riding in this vehicle on this railway in charge of appellant and that by some mischance in the operation of the car he was thrown out and injured, he had

made a *prima facie* case, and cast upon the carrier the burden of relieving itself of liability; and that the instructions were correct, unless .they should have been different because of the peculiar frame of the declaration. Each of the two counts of the declaration first stated that it was appellant's duty to exercise ordinary care for the safety of persons riding upon its railway. Then each count set out in detail the facts which in the view we have taken would require appellant to exercise the highest degree of care consistent with the practical operation of the road and the mode of conveyance adopted. It is not necessary that a declaration shall state the duty of the defendant, and if it does so, and states it inadequately or incorrectly, that statement may be treated as surplusage. The declaration must state the facts from which the law raises the duty. The most that can be said against this declaration is that each count first charges that it was appellant's duty to exercise ordinary care, and then states facts from which the law raises the duty to exercise the highest degree of care. We conclude that the statement of the duty to exercise ordinary care may be treated as surplusage, and therefore that his anomolous condition of the duration did not require the court to refuse the instructions referred to.

The first count of the declaration charged that the car suddenly stopped and that appellee was thereby thrown to the ground and injured. The second count charged that the car suddenly decreased its speed and stopped in a violent manner and partially tipped forward and that thereby appellee was thrown from the car and injured. We have already stated the testimony of Kirby that the car was barely moving, and again that it stopped, and tipped forward, and that he was thrown forward upon the iron handle, and that appellee was thrown out, and also appellee's evidence that the car was stopped, and afterwards that he did not know that it was entirely stopped. Appellant introduced testimony tending to show that it could not

have come to an entire stop at that place, for two reasons. Appellant's witnesses testified that there was not sufficient descent at that point for the force of gravity to have again started the car, and that if it had entirely stopped it would have remained stationary till the next car came behind it and struck it and started it and then the two cars would have reached the first brake station together; and the attendant at that station testified that the first car with Kirby in it reached his place the usual time before the next car arrived. Appellant's witnesses also testified that the cars were run ten seconds of time apart, and that if the car in which appellee was riding had been reduced to even three-fourths of its speed, it could not have regained its original momentum, and would have been struck by the next car. We place no great stress upon the evidence that the cars were run ten seconds apart. It is evident that while it was customary to wait at least ten seconds before starting another car, so that there would be no danger that the rear car would collide with the one ahead, yet the time taken by the passengers for the next car in paying their fares, procuring and surrendering their tickets and taking their seats in the car, might often consume more than ten seconds, and that the car would not be started till they were all seated. We are of opinion, however, that the evidence that there was not a sufficient decline in the track at that curve to start a car which was standing still makes it very improbable that this car came to an entire stop. It is argued that as each count of the declaration charged that the car was stopped there was a variance in the proof, and therefore a verdict for the plaintiff cannot be sustained. The second count, however, alleges that the car suddenly decreased its speed, as well as that it stopped, and if it suddenly decreased its speed, and partially tipped forward, and appellee was thereby thrown out, sufficient of the allegation would be proved to warrant a recovery, and the further allegation that the car stopped could be

treated as surplusage. A plaintiff is not obliged to prove every allegation of a count in his declaration, but it is sufficient if he prove enough of his declaration to establish his cause of action.

Appellant contends that the proof does not show that it was guilty of any negligence or was in any way responsible for the accident, and does not show what caused the accident; and also that the proof warrants the conclusion that appellee was not exercising due care. Appellant contends that appellee and Kirby must have been standing up, and that appellee was thrown out because he was standing up. Before the car left the starting platform appellee saw a sign which gave notice to passengers to look out for their hats. He testified that he took off his hat and held it in his right hand, being the hand next to Kirby. The man stationed at the first brake testified that when Kirby and the car reached the first brake Kirby was standing up with one hat on his head and with another hat (which was evidently appellee's hat) in his left hand, which was the hand next to where appellee sat before he was thrown out. From this appellant argues that both were standing up when the accident happened and were indulging in some kind of play. Kirby and appellee each testified that they did not stand up, but remained seated till thrown forward. Kirby testified that as he approached the first brake he started up for the purpose of getting out of the car there and going to the aid of appellee, and that that was the occasion of his standing up at the time he reached the first brake, but that he was prevented from getting out by the man at that brake and therefore did not get out till he reached the second brake. Kirby did not explain how he came to have appellee's hat in his hand. In this state of the proof we cannot say that the jury erred in finding that they were both properly seated when the accident happened. Kirby may have got appellee's hat in an effort to catch appellee as he pitched forward and out of the car. It was impossible

that appellee should know or be able to prove what caused the sudden slackening of the speed of the car on that sharp curve. It was in the night time, at a place which was in entire darkness. He was seriously injured and incapable of investigating the situation. He has no means of proving whether the car which appellant's employes inspected half an hour later was the one in which he was riding, nor whether anything had been done by other employes of appellant at the place of the injury before it was inspected the next morning, nor whether the character of the obstruction was such that evidence of it would be visible next day. It may be that the play between the sides of the trough in which the car ran, at the point on the curve where the accident happened, may have been such as to check the speed of the car suddenly. If, in such a case, the passenger must show exactly what caused the car to suddenly slacken its speed, then it would generally be impossible for a person injured under such circumstances to prove a case entitling him to recover compensation for his injuries. We conclude that if the jury believed that the speed of the car was suddenly checked at that point while appellee was in his seat, and that he was thrown therefrom, and injured thereby, such proof made a *prima facie* case.

It is argued that the judgment is excessive. Appellee was twenty-five years old and was earning $2.65 per day. His face and mouth were seriously injured. He was unable to work for thirteen weeks. He bears permanent scars upon his face, and the shape of his mouth is permanently distorted. The jury saw the permanent effect of his injuries upon his face and mouth, and after the trial judge had approved an allowance of $1,200 for his loss of time, pain and suffering and permanent disfigurement, we are unable to say that it is excessive.

The judgment is therefore affirmed.

*Affirmed.*