## LEONARD B. POINTER, Appellant, v. MOUNTAIN RAILWAY CONSTRUCTION COMPANY.

### In Banc, December 4, 1916.

1. **NEGLIGENCE: Res Ipsa Loquitur: When Available.** Where plaintiff has pleaded specific negligence he cannot rely upon presumption negligence under the rue of *res ipsa loquitur* to make out his case. Where the relation of carrier and passenger existed, the injured

passenger may plead negligence generally and upon proper proof sustain a recovery by invoking the doctrine of *res ipsa loquitur;* but if he pleads specific acts of negligence, those acts, or enough of them to justify a recovery, must be proven.

2. ———: ———: ———: **Specific Acts.** Where the petition charges the faulty and defective construction of the car of the scenic railway in which he was a passenger, the faulty and defective construction of the tracks of the "racer dips," and the negligent maintenance and operation of the cars over the tracks, and there is no evidence sustaining those allegations, the trial should direct a verdict for defendant, for having chosen the specific acts of negligence alleged plaintiff must stand upon them, and cannot invoke presumptive negligence from the mere fact that he was injured while riding on the car as a passenger. If the movement of the car at the time the passenger was injured was the usual and natural movement in the mode of transportation, negligence cannot be inferred from the injury alone.

*Held,* by BOND, J., dissenting, with whom WALKER and BLAIR, JJ., concur, that an allegation that the cars and track of the scenic railway, having a circuit of three-fourths of a mile, "were so faulty and so defectively constructed and defendants so negligently and carelessly maintained and operated the same that by reason thereof the car in which plaintiff was a passenger vibrated and shook so that plaintiff was thrown with much force against the back of the car, and his right foot and leg were suddenly and violently thrown upwards and out of the car, thereby causing his said right foot" to come in contact with the railings and posts along the track, and breaking his leg, states a case under the accepted definitions of general negligence, and testimony tending to support that general allegation entitled plaintiff to go to the jury; on the other hand, if the allegation constituted only averments of specific negligence it was sustained and the case should have gone to the jury upon the evidence which was to the effect that plaintiff became a passenger without any warning of the care and prudence necessary ·to be observed to render the trip safe, that no protection of handholds or other arrangements of seats to withstand the shock of sudden descents or sharp whirls were supplied by the carrier, that when the train reached its last ascent and began to descend on a sharp curve at a high rate of speed he was thrown first forward and then backward by a sudden jerk so powerful as to throw his foot outside the car, and that his foot immediately came in contact with the post which supported the horizontal guard on which the wheels of the car ran. The sudden jerk of the car was either an ordinary or an unusual occurrence; if an ordinary one, it afforded a sufficient basis for a reasonable inference of defective construction; if an unusual one, of sufficient force

to cause the injury, then proof of that fact called into play the rule of *res ipsa loquitur*.

3. ————: General Allegation: No Basis for Res Ipsa Loquitur. Even where the relation of carrier and passenger existed the mere fact that the passenger was injured is not itself evidence of the carrier's negligence, and the doctrine of *res ipsa loquitur* will not avail to supply the physical act that caused the injury. Negligence cannot be inferred from the mere physical fact that the passenger was injured.

4. ————: Absence of Protecting Appliances: Must be Pleaded. Absence of an operator on the scenic car on which plaintiff was a passenger at the time of his injury, absence of a hand-hold on the seat, the insufficient height of the sides of the seat, being well known acts of negligence, if relied on, should be pleaded.

5. ————: Scenic Railway: Inconveniences. A passenger who contracts for a pleasure ride upon a scenic railway, whose cars by gravity run rapidly down declines and by momentum up inclines and on tracks making short curves, the whole device being open to view, must subject himself to the inconveniences, jerks and even danger incident to the mode of travel; and if the only facts shown as having caused the accident are a slacking of the speed of the car as it reached an incline and a sudden acceleration of speed as it dipped down a decline, and a "wiggling" of the car from side to side as it rounded curves, and they are not shown to be unusual occurrences, he cannot recover for his injuries.

Appeal from St. Louis City Circuit Court.—*Hon. Wilson A. Taylor,* Judge.

AFFIRMED.

*James J. O'Donohoe* for appellant.

(1) The law holds the defendant to the highest degree of care and applies the doctrine of *res ipsa loquitur*. Tenn. State Fair Assn. v. Hartman, 183 S. W. 735; Hartman v. Tenn. State Fair Assn., 183 S. W. 733, citing Hollis v. K. C. Assn., 205 Mo. 508; Best Park Co. v. Rollins, 68 So. (Ala.) 417; Chesapeake Beach Ry. Co. v. Brez, 39 App. D. C. 58; Lee Line Steamers v. Robinson, 218 Fed. 563; Hughes v. Railroad, L. R. A. 1916A, 927, and note. The maxim *res ipsa loquitur* applies to many other classes of cases. Seiter v. Bischoff, 63 Mo. App. 157, runaway horse case; Gallagher v. Illuminating Co., 72 Mo. App. 576, falling lamp case; Sackewitz v. Biscuit

Co., 78 Mo. App. 144, falling drum; Shuler v. Railroad, 87 Mo. App. 618, employee injured in train collision; Tateman v. Railroad, 96 Mo. App. 448, licensee injured by falling door; Johnson v. Railroad, 104 Mo. App. 592, falling crowbar; Cleary v. Transit Co., 108 Mo. App. 433, loose trolley wire; Scharffey Const. Co., 115 Mo. App. 157, falling wall of uncompleted building case; Freeman v. Freeman, 141 Mo. App. 359, bailment; McFadden v. Lott, 161 Mo. App. 652, sightseeing automobile; Gannon v. Gas Co., 145 Mo. 502, death from fallen wire.   (2) The petition pleads general negligence and the doctrine of *res ipsa loquitur* applies.   Stauffer v. Railroad, 243 Mo. 325; Briscoe v. Railroad, 222 Mo. 104; Price v. Railroad, 220 Mo. 454; MacDonald v. Railroad, 219 Mo. 487; Chlanda v. Transit Co., 213 Mo. 244; Malloy v. Railroad, 173 Mo. 75; Patterson v. Traction Co., 178 Mo. App. 250; Nagel v. Railroad, 169 Mo. App. 292; More v. Railroad, 164 Mo. App. 34; Estes v. Railroad, 110 Mo. App. 725. Furthermore, a plaintiff who proves the happening of an accident and is otherwise entitled to presumptions arising therefrom, does not lose the benefit of such presumptions because he has alleged what he conceives to be the specific cause of the accident.   Gallagher v. Illuminating Co., 72 Mo. App. 576; Walters v. Railroad, 48 Wash. 233; Traction Co. v. Worrell, 86 N. E. 78; Lobb v. Railroad, 48 Wash. 238; Kluska v. Yeomans, 103 Pac. 819; McNeil v. Railroad, 130 N. C. 253; Dearden v. Railroad, 33 Utah, 143; Railroad v. Cotton, 140 Ill. 486; Railroad v. Carroll, 206 Ill. 318; Sullivan v. Rowe, 194 Mass. 500; Pierce v. Railroad, 22 Mont. 445; McNamara v. Railroad, 200 Mass. 491; Railroad v. Sheeks, 155 Ind. 74; Brick Co. v. Chevall, 119 Ga. 842. The caboose and palace car passengers stand upon a footing of exact equality before the national courts.   Railroad v. Horst, 93 U. S. 291; Railroad v. Lock, 17 Wall. 357; Railroad v. Nichols, 85 Fed. 948; Sprague v. Southern Ry., 92 Fed. 62; Traumbull v. Erickson, 97 Fed. 894; Railroad v. Crumpler, 122 Fed. 427.

*Charles E. Morrow* and *Schnurmacher & Rassieur* for respondent.

The defendant, operating an amusement device, is not a common carrier—but whether the defendant is or is not so regarded can make no difference in this case. The rule of *res ipsa loquitur* applies only where there is something which, unexplained, tends to show that some act of negligence on the part of the carrier was the proximate cause of the injury. A person taking a ride on such a device, like a passenger on a freight train, submits himself to the inconvenience and dangers necessarily attending their operation. It is a matter of common knowledge that jolting and jarring are incident to the operation of cars around curves or down hills, and negligence cannot be inferred from the mere fact that injury resulted from the jarring, unless such jarring was unusual or extraordinary. Hedrick v. Railroad, 195 Mo. 104; Bartley v. Railroad, 148 Mo. 124; Wait v. Railroad, 165 Mo. 612; Erwin v. Railroad, 94 Mo. App. 289; Tickell v. Railroad, 149 Mo. App. 648; Ray v. Railroad. 147 Mo. App. 332; Woas v. Transit Co., 198 Mo. 674. This doctrine was applied in the following cases, where injuries were sustained by patrons of amusement devices: Benedick v. Potts, 88 Md. 52, 41 L. R. A. 478, where the injury was sustained on a "miniature railroad." Fenner v. Amusement Co., 87 Atl. (N. J. L.) 344, where the injury was sustained on a device called the "Human Niagara Falls." Lumsden v. Thompson S. R. Co., 114 N. Y. Supp. 421, where the injury was sustained on a "scenic railway."

GRAVES, C. J.—Action for personal injuries. The sum first claimed was $50,000, but about the conclusion of the trial *nisi*, a gracious amendment of the petition reduced the sum to $25,000. Plaintiff was a metal polisher in the city of St. Louis, earning, when at work, four dollars per day, the amount to which the union of which he was a member limited the earnings of their members. Country-bred, he had not at the date of the accident been fully initiated in all the amusements of a great city

although he had lived there for a considerable time. His chum, Arthur Boardman, was of city origin, but not fully acquainted with some of the devices for entertaining a metropolitan public. At least they both disclaimed knowledge of the operation of a certain scenic railway called "The Racer Dip," and in the petition alleged to have been operated at Forest Park Highlands by the Park Circuit & Realty Company and the Mountain Railway Construction Company. So close was the relationship of the two that we find the following from Boardman in the course of his testimony:

"Q. What interest have you in this case that you continually, when I ask you one question, put in something at the tail end that nobody asks you for? A. Well, this is a friend of mine, and we had it made up to stick together, and I am going to stick to the finish."

On a Sunday evening early in May, 1910, these two friends, after partaking of a couple of bottles of beer each (according to Boardman), which beer was obtained from a negro bootlegger in the vicinity of plaintiff's home, repaired to plaintiff's home, where they had supper. After supper they visited Delmar Garden for a short time and then wended their way to Forest Park Highlands, and whilst there were attracted to the scenic railway or "Racer Dips." The cars and tracks of this miniature railway were in plain view and could have been seen had they looked. The evidence shows, though not from these two parties, that the cars and most of the tracks were in open view for a person standing at the platform from which the trains started. The evidence shows that "The Racer Dips" was a device for public entertainment, consisting of two miniature railway tracks upon which separate trains of small cars were run and so arranged that there was the appearance of racing between the two trains. The tracks had a common starting point and a common ending point. By mechanical force the trains of cars were pulled up grade to a considerable height and then turned loose to make the trip by gravity. This was accomplished by steep declines and elevations in the tracks so that the momentum gath-

ered by going down a decline would carry the trains up the next elevation. Of necessity these declines and elevations were marked and sharp and had to follow each other in rapid sucession. Variety was added to the trip by acute and sharp curves in the tracks as well as by a tunnel constructed thereover. Gravity being the sole power operating the train, the speed down the incline would be great and this speed would slacken gradually until the succeeding elevation was passed and the next decline reached. When the car turned the next decline it of necessity picked up speed rapidly.

The evidence discloses that these trains were made up of three cars having three seats each, and which seats would accommodate two pleasure seekers. In other words, eighteen persons constituted a train-load. While plaintiff was not always clear in his testimony, yet, taken as a whole, the evidence shows that plaintiff and his friend took passage on this pleasure device in the middle seat of the middle car of one of these trains. It is made quite clear that they were not in the front seat of the car. When the train was nearing the end of the journey plaintiff's foot got out of the car and struck an object to the side of the car, and a severe fracture of the right leg resulted, together with some other injuries.

It appeared from the evidence that the Park Circuit & Railway Company was the holding company for the defendant Mountain Railway Construction Company, and was not, itself, engaged in the actual operation of the pleasure device known as the "Racer Dips." But, whilst it held and owned the stock of the operating company, it was not, in fact, operating the device. Upon this showing plaintiff voluntarily dismissed as to such corporation.

The plaintiff's case largely turns upon the testimony of himself and his friend, although he introduced some other evidence which will be noted in the course of the opinion.

Going to the pleadings, it will be seen that the negligence of the defendant is thus stated in the petition:

"That said racer dip, the cars and tracks thereon were so faulty and so defectively constructed and defendants so negligently and carelessly maintained and operated the same that by reason thereof the car in which plaintiff was a passenger as aforesaid vibrated and shook so that the plaintiff was thrown with much force against the back of the conveyance or car in which he had passage, and plaintiff's right foot and leg were suddenly and violently thrown upwards and out of said conveyance or car, thereby causing his said right foot and leg to be caught in and thrown upon and against railings, posts and uprights along and outside of said conveyance or car, through which plaintiff was greatly and permanently injured, as follows."

The answer filed by defendant thus reads:

"Come now the defendants in the above-entitled cause and for answer to the plaintiff's amended petition deny each and every allegation in said amended petition contained and set forth.

"Further answering, defendants say that what, if any, injuries were received by the plaintiff on the occasion in question and by and on account of the things mentioned in his amended petition were caused by the ordinary and usual movements of the racer dip mentioned in the plaintiff's petition, which was an amusement device, the real attractiveness of which depended solely upon the sensations that rapid changes of speed give the person using it and that the plaintiff assumed all such dangers and risks and on account thereof cannot recover.

"Further answering, defendants say that what, if any, injuries plaintiff received on the occasion in question and by and on account of the things mentioned in his amended petition were caused by his own negligence in this:

"That the plaintiff negligently and carelessly failed to remain in his seat in the car and negligently and carelessly threw his feet up and outside of the car and negligently and carelessly failed to hold to the car in which he was riding and negligently and carelessly failed

to keep a lookout for his own safety, and that by reason thereof threw his right leg up, above and outside of the car in which he was riding, whereby he received what, if any, injuries complained of in his amended petition and that the same were caused by his own negligence contributing thereto.

Wherefore, having fully answered, defendants pray to go hence and recover of plaintiff their costs herein.''

The reply was a general denial.

Upon a trial the court gave to the jury a peremptory instruction to find for the defendant, and plaintiff chose to submit his case to the jury rather than take an involuntary nonsuit. Verdict and judgment were for defendant, and plaintiff has appealed. The evidence in greater detail will be considered in the course of the opinion in connection with the points made therein

I. In his petition plaintiff avers that he was a passenger for hire, and to break the force of the want of proof invokes the doctrine of *res ipsa loquitur*. There

**Pleading: Res Ipsa Loquitur.** is absolutely no proof in the record that the train of cars upon which plaintiff was injured was run otherwise than in the usual and ordinary manner for the operation of trains upon this pleasure device or other similar pleasure devices. Both plaintiff and his chum disclaim any knowledge of how such trains should be, or were in fact, run. Plaintiff tried to make no proof that the train at the time of the accident was run otherwise than in the customary and usual manner. He put on as a witness a man connected with the defendant company, and this man testified that he examined both the cars and the track immediately after the accident, and they were in good and proper condition. There is no showing that the cars and tracks were not constructed just as cars and tracks are usually constructed for such purposes. Both plaintiff anl his friend testify that the train was pulled to a given height and then loosed for gravity action thereafter. The manner of the accident had best be given in their own language. Plaintiff says:

"Q. Now, will you tell the jury if you had any accident there and how it happened? A. I was sitting in one of these cars and sitting on the right side and it started out on the run and got very near all the way around and the car slackened speed and threw me forward and started up all of a sudden and threw me backward and shot up that way (indicating) and threw me to one side and threw my right foot out and caught my leg.

"Q. When your foot was thrown out, what happened to it? A. It was caught against posts or uprights or rails and along side the track where the car was."

Arthur Boardman, his friend, says:

"Q. Was Pointer injured on that occasion? A. Yes, sir.

"Q. Will you state just how he was injured? A. Yes, sir. We was on the last curve coming in and the car was running at a high speed and the car slacked up, kind of, and he was throwed up forward and the car started up at a pretty high speed again, which naturally turned him back and his right foot fell between the car and the railing, the outside railing.

"Q. Between what track? A. The railing.

"Q. Did it catch on anything on the outside? A. When the car kind of wiggled, it naturally caught his foot.

"Q. What do you mean by wiggled? A. Well, (indicating) kind of shaked from one side to the other."

Plaintiff's Exhibit "C" shows the construction of the cars and the seats thereof, although it is conclusively shown by the evidence that there are three seats to the car. Plaintiff being in the middle seat his position can be seen at a glance at this exhibit, which we here insert.

269 Mo.—8

It is practically conceded that there is no case for the jury unless the doctrine *res ipsa loquitur* bridges over the chasm and puts the case to the jury. Under the facts, can such doctrine be invoked? Of the several phases of this question later.

II. The doctrine *res ipsa loquitur* is not in this case, and without the invocation of that rule it is conceded that plaintiff's case failed *nisi*.

The petition filed by plaintiff excludes the application of the *res ipsa loquitur* doctrine. This plaintiff has pleaded specific negligence, and in such case he cannot rely upon presumptive negligence under the rule *res ipsa loquitur* to make out his case. One who pleads specific acts of negligence must prove such negligence or enough of such acts to justify a recovery, and a failure so to do bars him from a recovery. And this is true although he might have pleaded negligence generally and by an invocation of the doctrine *res ipsa loquitur* had a recovery upon making proper proof. We have

Specific and General Negligence.

gone over this question throughly in several recent cases. [McGrath v. Transit Co., 197 Mo. 97; Orcutt v. Century Building Co., 201 Mo. 424; Roscoe v. Metropolitan Street Ry. Co., 202 Mo. 576; Price v. Metropolitan Street Ry. Co., 220 Mo. 1. c. 453 et seq.]

Now, in the petition before us in this case the plaintiff avers (1) the faulty and defective construction of the cars used on the "Racer Dips;" (2) the faulty and defective construction of the tracks of the "Racer Dips;" and (3) a negligent maintenance and operation of the cars over such tracks.

This charge of negligence cannot be tortured into a general charge of negligence. It specifically charges (1) a negligent construction of the car upon which plaintiff was riding, and (2) a negligent construction of the tracks upon which such car was operated. This places the case beyond the reach of the doctrine of presumptive negligence nurtured by the rule of *res ipsa loquitur*.

In the McGrath case, supra, 197 Mo. 1. c. 105, we said:

"But even if it were a case to which, under proper pleadings, the doctrine would apply, yet in this case specific acts of negligence are charged and not general negligence. In such cases where the plaintiff chooses in the petition to allege specific acts of negligence, the rule of law places the burden of proving such specific negligence upon the plaintiff, and a recovery, if had at all, must be upon the specific negligence pleaded. [Hamilton v. Railroad, 114 Mo. App. 1. c. 509; Ely v. Railroad, 77 Mo. 34; Leslie v. Railroad, 88 Mo. 50; Yarnell v. Railroad, 113 Mo. 570; Bunyan v. Railroad, 127 Mo. 1. c. 19; Hite v. Street Ry. Co., 130 Mo. 1. c. 136; McManamee v. Railroad, 135 Mo. 1. c. 447; Bartley v. Street Ry. Co., 148 Mo. 1. c. 139; Gayle v. Mo. Car & Foundry Co., 177 Mo. 1. c. 450; Breeden v. Mining Co., 103 Mo. App. 1. c. 179.]"

In the Roscoe case, supra, 202 Mo. 1. c. 587, we said:

"The petition charges specific negligence and not general negligence, as plaintiff would have had the right to charge in this class of cases. A general allegation of negligence is all that is required in cases of accidents, where the relation of passenger and carrier exists. This general allegation of negligence is permitted upon the theory that the instrumentalities are in the hands of the defendant and he knows the condition thereof, whereas plaintiff does not or may not know them. Not only does the established rule permit a general allegation of negligence, but in making the proof it is sufficient to show an accident and the resultant injury, whereupon there is a presumption of negligence, and a prima-facie case for plaintiff is made. What we have said above applies to cases where there is a general allegation of negligence, but the rule is different where there are specific allegations of negligence. The rule as to proof is different, and the rule as to the presumption is different. General allegations of negligence are permitted because plaintiff, not being familiar with the instrumentalities used, has no knowledge of the specific negligent act or acts occasioning the injury, and for a like reason the rule of presumptive negligence is indulged. But, if plaintiff by his petition is shown to be sufficiently advised of the exact negligent acts causing, or contributing to, his injury, as to plead them specifically, as in this case, then the reason for the doctrine of presumptive negligence has vanished. If he knows the negligent act, and he admits that he does so know it by his petition, then he must prove it, and if he recovers it must be upon the negligent acts pleaded and not otherwise. In other words, the burden of proof is upon plaintiff as it would be in any other kind of a case. The rule of presumptive negligence and the rule allowing the pleading of negligence generally, are rules which grew up out of necessity in cases of this character and are exceptions to the general rules of pleading and proof. Where plaintiff, by his petition, admits that there is no necessity, the rea-

son for the rule *ex necessitate* fails, and with it the rule itself."

But in the case at bar the plaintiff says his injuries were due to a negligently constructed car and a negligently constructed track. He points out the negligence of defendant which caused his injury. One cannot plead specific acts of negligence and rely upon presumptive negligence to bridge the chasm in making out a case for the jury. The trial court evidently so viewed this case, and as there was absolutely no evidence upon which a verdict could stand upon the specific negligence alleged, he rightfully directed a verdict for defendant.

Plaintiff realizing that he had proved all that he could prove, chose to submit his case and take a verdict rather than to take an involuntary nonsuit.

It matters not whether his specific negligence was as well pleaded as it might or should have been. It is only necessary to determine that his plea was one of specific negligence. The defendant had the right to move for more specific pleading if he thought the specific negligence was not as well pleaded as it should have been, or it had the right to accept it as sufficiently pleaded. The negligent construction of a track is specific negligence, and we have so held. [Price v. Metropolitan Street Ry. Co., 220 Mo. l. c. 454.] So, likewise, is the negligent construction of a car specific negligence, and this is in effect held in the Price case, supra.

The fact that the plaintiff chose to simply charge that the track was negligently constructed without naming the particular fault of construction simply gave him a roving commission to prove any and all defects; and if defendant chose not to challenge the pleading, it had a right so to do, but that does not make the charge any the less specific rather than general negligence.

A fair sample of a plea of general negligence appears in the Price case, supra, 220 Mo. l. c. 454.

Under the pleadings in this case the plaintiff cannot invoke the doctrine of *res ipsa loquitur*, and his case failed *nisi*, and the judgment should be affirmed.

In 5 R. C. L. 84, the general rule is thus tersely expressed:

"In any event, where the cause of the accident by which a passenger was injured is known as well to the passenger as to the carrier, the presumption of negligence which arises from the fact of the injury of a passenger while on the carrier's vehicle has no application, but the passenger must affirmatively show negligence."

In this case the plaintiff avers that his injury was occasioned by a defective car and a defective track. He thus says that he knows the cause or causes of his injury, and the rule just quoted applies.

There is no question as to what the rule is in Missouri. [*Vide* list of cases collated in McGrath v. Transit Co., supra.] In 5 R. C. L. 84 et seq., it is said:

"When the plaintiff chooses to allege the specific acts of negligence of which he complains, the authorities are not in harmony as to the effect of such allegation upon the operation of the doctrine of *res ipsa loquitur*. According to some authorities, the plaintiff, by thus alleging the specific acts of negligence, assumes the burden of proving them, and as in other cases, must recover if at all, upon the negligence pleaded, and the doctrine of *res ipsa loquitur* does not apply. Other decisions, however, are to the effect that the plaintiff does not lose the right to rely upon the doctrine of *res ipsa loquitur* by attempting to show particularly the cause of the accident, at least where at the close of the testimony the cause does not clearly appear, or if there is a dispute as to what such cause was."

As to the first named rule in this quotation the Missouri cases and some others are referred to, and as to the latter rule cases from Washington, Massachusetts and Virginia are cited. All the text-writers recognize the Missouri rule and state it as we have stated it. Our cases proceed upon the very reasonable theory that if the plaintiff alleges in his petition the things which caused the injury, such allegations evince his knowledge of the causes of his injury, and he is bound there-

by, and his case falls within the first rule quoted from 5 R. C. L., supra.

In an extensive note to Walters v. Railroad, 24 L. R. A. (N. S.) 1. c. 792, it is said:

"This question has arisen more frequently in Missouri than in any other jurisdiction, and the cases are for the most part harmonious in holding that the doctrine of *res ipsa loquitur* applies only where the petition charges negligence in general terms, and does not apply where it specifically pleads the negligent acts which caused the injury."

Some twenty-odd Missouri cases from this court and the courts of appeal are collated, and all of them support the text. In accord with the Missouri rule the following cases are also cited: Norton v. Railway Co., 108 S. W. (Tex.) 1044; Traction Co. v. Leonard, 126 Ill. App. 189; Railroad v. Martin, 154 Ill. 523; Highland Ave. & Belt R. R. Co. v. South, 112 Ala. 642; Brewing Co. v. Willie, 114 S. W. 186.

III. Granting, for the sake of argument only, that this case is governed by the rule in cases of carrier and passengers, the facts fail to make a case for the invocation of the doctrine *res ipsa loquitur*. It is not every case where an injury is suffered and where that relation exists that the facts shown bespeak negligence. Each case must be determined upon its own facts. In Whittaker's Smith on Negligence (Enlarged Edition, with notes by Webb), p. 522, it is said:

**When Rule of Res Ipsa Loquitur is Applicable.**

"It has already been stated, that in actions of negligence (as indeed in all actions) the plaintiff must give some proof of his case beyond a mere scintilla of evidence, and if he does not, it is the duty of the judge to direct a nonsuit. The question of what is sufficient evidence to go to the jury is one for the judge in the particular case before him; but there are a class of cases in which there has been no direct evidence of any particular act of negligence, beyond the mere fact that something unusual has happened, which has caused the

injury; and upon the maxim, or rather phrase, *'res ipsa loquitur,'* it has been held that there is evidence of negligence. As the phrase imports, there must be something in the facts which speaks for itself, and therefore each case will depend upon its own facts, and it will be difficult to lay down any guiding principles.''

The mere fact that the plaintiff was injured is not of itself evidence of defendant's negligence. Nor will the mere fact of injury without other facts authorize the application of the rule of presumptive negligence as such rule is recognized by the doctrine *res ipsa loquitur.* Before the rule *res ipsa loquitur* can be invoked there must be shown facts, other than of the mere fact of injury to plaintiff, from which the negligence of defendant can be reasonably inferred. These other facts, in case of carrier and passenger, must show that something out of the ordinary, in the course of carriage, has happened, as to the means, or methods of transportation, and that this extraordinary happening was the cause of the injury to plaintiff. If there is no evidence tending to show that something unusual and out of the ordinary has happened, as to the means of transportation (which includes the appliances used in the transportation) or in the method of transportation (which includes the acts of agents, etc.), then the rule *res ipsa loquitur* cannot be invoked, although the facts may disclose injury to plaintiff. [Benedick v. Potts, 88 Md. l. c. 55 et seq.]

The reasoning of the Maryland case is so well stated that we quote:

"In no instance can the bare fact that an injury has happened, of itself and divorced from all the surrounding circumstances, justify the inference that the injury was caused by negligence. It is true that direct proof of negligence is not necessary. Like any other fact, negligence may be established by the proof of circumstances from which its existence may be inferred. But this inference must, after all, be a legitimate inference and not a mere speculation or conjecture. There must be a logical relation and connection between the cir-

cumstances proved and the conclusion sought to be adduced from them.   This principle is never departed from, and in the very nature of things it never can be disregarded.   There are instances in which the circumstances surrounding an occurrence and giving a character to it are held, if unexplained, to indicate the antecedent or coincident existence of negligence as the efficient cause of an injury complained of.   There are the instances where the doctrine of *res ipsa loquitur* is applied.   This phrase, which literally translated means that 'the thing speaks for itself,' is merely a short way of saying that the circumstances attendant upon an accident are themselves of such a character as to justify a jury in inferring negligence as the cause of that accident; and the doctrine which it embodies, though correct enough in itself, may be said to be applicable to two classes of cases only, viz., first, 'when the relation of carrier and passenger exists and the accident arises from some abnormal condition in the department of actual transportation; second, where the injury arises from some condition or event that is in its very nature so obviously destructive of the safety of person or property and is so tortious in its quality as, in the first instance at least, to permit no inference save that of negligence on the part of the person in the control of the injurious agency.'   [Thomas on Neg. 574.]   But it is obvious that in both instances more than the mere isolated, single, segregated fact that an injury has happened must be known.   The injury, without more, does not necessarily speak or indicate the cause of that injury—it is colorless; but the act that produced the injury being made apparent may, in the instances indicated, furnish the ground for a presumption that negligence set that act in motion.   The maxim does not go to the extent of implying that you may from the mere fact of an injury infer what physical act produced that injury; but it means that when the physical act has been shown or is apparent and is not explained by the defendant, the conclusion that negligence superinduced it may be drawn as a legitimate de-

duction of fact. It permits an inference that the known act which produced the injury was a negligent act, but it does not permit an inference as to what act did produce the injury. Negligence manifestly cannot be predicated of any act until you know what the act is. Until you know *what* did occasion an injury, you cannot say that the defendant was guilty of some negligence that produced that injury. *There is, therefore, a difference between inferring as a conclusion of fact what it was that did the injury; and inferring from a known or proven act occasioning the injury that there was negligence in the act that did produce the injury.* To the first category the maxim *res ipsa loquitur* has no application; it is confined, when applicable to all, solely to the second. In no case where the thing which occasioned the injury is unknown has it ever been held that the maxim applies; because when the thing which produced the injury is unknown it cannot be said to speak or to indicate the existence of causative negligence. In all the cases, whether the relation of carrier and passenger existed or not, the injury alone furnished no evidence of negligence—something more was required to be shown.''                    ,

With this general outline of the law, let us get the facts of the case. In justice to defendant they should be fully stated. It is undisputed that nothing occurred until the train was turned over to the immutable law of gravity, a law of nature unbending and ever faithful when it has a duty imposed. Gravity is the same at all times under same and similar circumstances. Its work is done without a variance and only a variance in the means of its application will show variant results. Plaintiff proved by his own witness there was nothing wrong with the car upon which he rode or the track upon which said car traveled. Both he and his friend testified that they did not know that plaintiff had been injured until the journey was over, and the friend jokingly cursed the plaintiff and told him to get up out of the car. Whilst they do say the car ''slackened up, kind of,'' and then ''the car started up at a pretty high

speed again," yet they do not testify that this was an unusual occurrence in the operation of "racer dips." There is not even a scintilla of evidence that cars moving up and down inclines and declines by the force of gravity would not actually do this very thing. On the contrary, our knowledge of the laws of physics leads us to know that such would be the natural movement. Going down the decline the speed would be rapid, but in going up the incline the momentum gathered would gradually decrease until the speed would slacken at or near the crest of the next hill, and then rapidly increase as the car took the next decline. This condition is all that is described by either of these two witnesses. They do not claim that the car stopped or that it suddenly lurched. It devolved upon plaintiff to show that the movement of the car upon which he was riding was an unusual one for cars in the mode of transportation he was then using. He made no attempt to do this, and no negligence can be inferred from this very natural movement of the car.

The only other movement of the car is thus described by the friend of plaintiff in telling how plaintiff's foot was caught. He says: "The car kind of wiggled," and being asked what he meant by that, he said, "Well (indicating) kind of shaked from one side to the other," and that this shaking was more on the last curve than on any other portion of the dip. This is the sum total of the evidence upon the question of the movement of this car. There is no evidence in the record or tendered in the record to the effect that the movements described by the witnesses were anything unusual for the cars in this particular mode of transportation. It was shown that this pleasure device was made up of tracks going down declines, ascending inclines and going around acute or sharp curves. There is not a syllable in the testimony that these "wiggles" or movements from side to side of the car were not usual movements of cars used in this mode of transportation. We shall discuss the mode of transportation more thoroughly in other paragraphs.

Pointer v. Mountain Ry. Const. Co.

Before the rule *res ipsa loquitur.* can be invoked, something more than the usual happenings (exclusive of the mere fact of injury) must be shown by the testimony. In this case two other passengers were in the same car with plaintiff and his friend, and they arrived at their destination in safety. Other cars (two more) were in the train and nothing occurred to their passengers. The car returned without injury or accident, and the tracks were found intact.

Something is said about the absence of a handhold for passengers. For that reason we have copied into our statement the drawings of the cars as such drawings were introduced in evidence by plaintiff. It is conclusively shown by the evidence that there are three seats in each car, and plaintiff says he was in the seat next to the rear seat of the car, and that the rear seat was occupied by two other passengers. The drawings of this car show that plaintiff could have held on to (1) the side of the seat, (2) the back of the seat, and (3) the back of the seat in front of him, yet he says that at the time of the accident he had his arm around his friend's shoulders. He first said partly around the shoulders and partly upon the back of the seat, but being driven down to facts finally said his arm was only around his friend's shoulders and the other hand was in his lap. He was on the right hand side of the car, and thus it appears he rode with his left hand around the shoulders of his friend and his right hand (the one next to the outside of the car and which should have had hold of the side of his seat for safety) was in his lap. Take one view of the drawing in the statement and the contributory negligence of plaintiff is apparent. It took four minutes to make the trip. It was one continuous ascent and descent and rounding of curves. Even if plaintiff had no knowledge of the danger in the first instance, he had gone far enough to see that common prudence would dictate the use of his hands for safety. Barren as this case is of facts tending to show negligence, the trial court could have done but one thing, and that is just what it did do.

We are cited to the following as being authority for holding that the facts of this case bring it within the rule *res ipsa loquitur*: "Wigmore on Evidence, vol. 4, sec. 2509, and cases cited in note; 5 R. C. L., sec. 713, p. 74; 29 Cyc. 591 and cases cited; Sweeney v. Erving, 228 U. S. 233; Brown v. Railway, 256 Mo. 522; Dougherty v. Railway, 81 Mo. 325; Gallagher v. Edison Illuminating Co., 72 Mo. App. 1. c. 579; O'Callaghan v. Dellwood Park Co., 242 Ill. 336, 149 Ill. App. 34; Redmon v. Railway, 185 Mo. 1. c. 10; Price v. Met. St. Ry. Co., 220 Mo. 1. c. 457; Logan v. Railway, 183 Mo. 1. c. 606; Whittaker's Smith on Neg., p. 552; Turner v. Haar, 114 Mo. 1. c. 346-7; Hughes v. Railway, L. R. A. 1916A, p. 927, and notes page 930 et seq."

Of the Missouri cases first: In Brown v. Railroad, 256 Mo. 1. c. 535, it is said:

"The evidence is undisputed that the train was thrown from the track by the fracture of one of the steel rails while passing over it and transporting plaintiff who was a passenger."

This case is all right and in accord with what we now urge, but it must be noted that an unusual thing was shown, i. e., the derailment of a car.

In Dougherty v. Railway, 81 Mo. 325, a very unusual jerk of a car was shown.

In Gallagher v. Edison Illuminating Co., 72 Mo. App. 1. c. 596, an arc light was shown to have fallen from its position on plaintiff's head as he passed thereunder.

In Redmon v. Railway, 185 Mo. 1. c. 10, a train of two street cars came to a very sudden stop, thereby producing a very violent jerk, which injured plaintiff— very different from the case at bar, where the evidence is the car "slacked up, kind of" and then "the car started up at a pretty high speed again."

In Logan v. Railway, 183 Mo. 1. c. 606, the street car left the track.

The case of Turner v. Haar, 114 Mo. 1. c. 346-7, is cited. That case does not involve the question at all. An employee was suing for an injury occasioned by the falling of a building in which the employer placed

him to work. He charged an unsafe working place. The building blew down in a storm. Without going further, it will be seen the facts do not fit here, nor does the law.

Price v. Met. Street Ry. Co., 220 Mo. 457, is given as authority here. In that case there was a collision between two cars on a street railway. We shall not stop to argue that such a fact is not in the case at bar. There was clearly an unusual occurrence in the Price case.

Suffice it to say that the text-books and the cases from the Federal and other state courts cited on this proposition are no nearer in point than the Missouri cases which we have analyzed. These cases and these texts are discussing unusual and extraordinary occurrences in the course of operation. The facts in the case at bar do not measure up to that standard. We concede that an unusual or extraordinary occurrence (excluding the mere fact of injury) may raise a presumption of negligence on the part of the carrier. If in the case at bar the train had been brought to a sudden stop in rounding this curve and going down the incline, a different case would be presented. It would have been an unusual occurrence. But here we only have the slackening of speed, which was natural as the train went up hill, an increase of speed, which was natural for a gravity train going down steep inclines, and a "wiggling" of the car, which was natural upon acute and sharp curves. Nothing unusual, under the facts shown, save mere injury to the plaintiff, and this of itself will not invoke the doctrine res ipsa loquitur.

Other suggestions are made as to the absence of an operator on the car, as to the absence of a handhold, and as to the sides of the car not being sufficiently high. We need not discuss these matters, because they were all known acts of negligence, and if relied upon should have been pleaded. However, the evidence in the record does not show or tend to show that these things or either of them contributed to plaintiff's injury. The evidence shows that he could have held himself in the car by using the side of his seat or the back of the seat

in front of him, and, further, the drawing introduced
in evidence shows the very handhold of which he com-
plains. But we will not discuss these matters because
in our judgment they are not pertinent.

IV. Still proceeding upon the theory that the relation
of plaintiff to defendant is that of carrier and pas-
senger, yet we must not blind ourselves to the kind of
carriage plaintiff was contracting for, and
the relative duties of the parties under the
facts. Plaintiff knew he was contracting
for carriage upon a pleasure device, which device with
its tracks of dips and curves was before him, as a cir-
cular swing stands before one contracting to ride upon
it. He knew he was making no contract for a Pullman
car upon the level tracks of a steam railroad. When
he contracted for this peculiar carriage, it was written
in such contract, by the law, that he must subject him-
self to the inconveniences, jerks and even dangers usu-
ally incident to that mode of conveyance. This is
clearly shown by our cases involving injuries to pas-
sengers upon freight trains. Thus in Wait in Railway,
165 Mo. l. c. 621, BRACE, J. said:

"It seems now to be well-settled law here, as else-
where, that where a railroad company carries passengers
for hire on its freight trains 'it must exercise the same
degree of care as is required in the operation of its reg-
ular passenger trains, the difference only being that the
passenger submits himself to the inconvenience and dan-
ger necessarily attending that mode of conveyance.'
[Whitehead v. St. Louis, I. M. & S. Ry. Co., 99 Mo. 263;
McGee v. Mo. Pac. Ry. Co., 92 Mo. 208; Wagner v. Mo.
Pac. Ry. Co., 97 Mo. 512; Hays v. Wabash Ry., 51 Mo.
App. 438; Guffey v. Han. & St. J. Ry. Co., 53 Mo. App.
462; Ohio & Miss. Ry. Co. v. Dickerson, 59 Ind. 317;
Chicago & Alton Railroad v. Arnol, 144 Ill. 261; Olds
v. Railroad, 172 Mass. 73.] The rule upon this subject is
very clearly expressed in the two cases last cited. In the
last one, decided by the Supreme Court of Massachu-
setts in 1898, KNOWLTON, J., speaking for the court,

said: 'The law is clearly expressed in Chicago & Alton Railroad v. Arnol, 144 Ill. 261, 270, as follows: "Persons taking passage upon freight trains, or in a caboose or car attached to a freight train, cannot expect or require the conveniences or all of the safeguards against danger that they may demand upon trains devoted to passenger service, and are accordingly held to have accepted the accommodation provided by the company, subject to all the ordinary inconveniences, delays, and hazards incident to such trains, when made up and equipped in the ordinary manner of making up and equipping such trains, and managed with proper care and skill . . . But if a railway company consents to carry passengers for hire by such trains, the general rule of responsibility for their safe carriage is not otherwise relaxed. From the composition of such a train and the appliances necessarily used in its efficient operation, there cannot, in the nature of things, be the same immunity from peril in traveling by freight train as there is by passenger trains, but the same degree of care can be exercised in the operation of each. The result in respect of the safety of the passenger may be wholly different, because of the inherent hazards incident to the operation of one train and not to the other, and it is this hazard the passenger assumes in taking a freight train, and not hazard or peril arising from negligence or want of proper care of those in charge of it." . . . The plaintiff in the present case well understood the kind of business in which the defendant was engaged, and the manner in which the business was conducted. So far as there were dangers naturally incident to the running of freight cars and a passenger car in the same train, the parties must be presumed to have contracted in reference to them, and the plaintiff to have assumed them.' "

In this Wait case, the plaintiff thus testified as to the things which caused his injury:

" 'I got on at the water tank, and the train started out. A man by the name of Rickett got on with me, and there was one other man on the train, both stran-

gers to me.  The train started out; and just as the
caboose had got a little past the depot, I supposed the
train had pulled out for good; and I raised up in my
seat to take off my overcoat, and I stepped out of the
seat kind of sideways, and I had my left arm throwed
out like that, when all at once the train stopped sud-
denly and it throwed me.  There was a seat directly
in front of me that had no back on it, it was broke off;
and the next seat was turned the other way and the
other one this way and throwed two backs together;
and I struck my back and side right across those two
seats; and I went on there with force enough that I
broke them right down, and it kind of stunned me at
first, and it knocked the breath out of me and I lay
there for a half minute, and got up and sat down in
the seat.  I could hardly speak and could hardly catch
my breath  .  .  .  I went on to Green Castle and got
off there.  I could hardly get up town.  When I went
up street I vomited blood, and went and saw a doctor.
That night I took the passenger train for my home
at Cedar Rapids, Iowa, and got there next day.''

Upon these facts, Judge BRACE said:

''There is no conflict in the evidence.  There is no
evidence tending to show any defects in defendant's
track, train or any of its appliances.  No evidence tend-
ing to show any want of skill or care on the part of
its employees in the management of the train from the
time plaintiff got on it until the accident happened, or
that the train was stopped at an improper place, or
in an improper manner, or that the shock which caused
his fall was not a natural and ordinary incident of the
stopping of such a train in a proper manner, by the
proper application of the proper means, for that pur-
pose.  In other words, there were no facts proved from
which an inference of negligence on the part of defend-
ant could be legitimately drawn.''

In the Wait case, supra, the trial court sustained a
demurrer to the evidence, and this court sustained that
rule.

269 Mo.—9

In Hedrick v. Railway, 195 Mo. 1. c. 111, GANTT, J., thus sets out the facts:

"Plaintiff's account of what took place at Lamonte was that after the train got to Lamonte it was *in a manner* stopped; two of the trainmen had already left the caboose, and the plaintiff got up and started to the rear end of the car, and there was a jump, he did not know what happened, but thought the train had collided, and for a moment or two he did not know what had happened and when he came to himself, he felt that he was injured, and sat down on a seat—went to a seat and sat down, and at that time the train was perfectly still. The caboose, after the train stopped, was in the neighborhood of a hundred or a hundred and fifty yards from the depot at Lamonte. He testified that when he came to himself, he was on his feet, and could not state whether he had been thrown down or not. He testified that he had traveled a number of times in cabooses attached to freight trains, and on freight trains, and he was then asked the effect that the stopping of the train had, and he answered, 'The reaction on the car was so severe that it upset the water tank in the caboose and spilled water all over the floor.' 'That jar was severe—the severest I ever experienced on a freight train.' 'The extent was so hard it upset the water tank in the car.' 'It jerked me senseless and injured my neck.' On cross-examination, he testified that when he started to go to the rear end of the caboose 'the train was barely moving, it was not running one mile an hour; not near as fast as a man could run or walk, it was not going as fast as a man could walk, the rate of speed was so that a child could walk and get off if it had not been jarred.' He was asked whether he was thrown down, and answered, 'Well, I do not know whether I was or not, right there is where I never will be clear; I do not think I went to the floor. I was stunned for a minute or two.' Asked whether or not he struck his head, neck or arm against anything in the caboose at that time, he answered, 'I think I kind of caught myself on the—

against the door casing or against the door as it swung, the jar was so violent and severe.' "

After quoting and approving what we have quoted from the Wait case, supra, and after a thorough review of other Missouri authorities, Judge GANTT, proceeds thus:

"It is well settled that negligence cannot be presumed when nothing is done out of the usual course of business, unless the course is improper. There is nothing in this record to indicate that there was any act of omission or commission not usually incident to the constant moving of heavy freight trains under the control and management of skillful and careful employees. We are not unmindful of the contention of the plaintiff that the defendant jerked or knocked or bumped the train with unusual, unnecessary and extraordinary force against the caboose, but we are clearly of the opinion that in the light of the uniform expressions of this court and of the several appellate courts, the evidence in this case was wholly insufficient to establish any such unusual and extraordinary jarring and jerking.

"In our opinion the basic fact upon which a recovery must rest in this case, to-wit, the negligence of the defendant, was not established either by the positive testimony of the witnesses or by any presumption of negligence arising out of the facts developed, and it results that the plaintiff was not entitled to recover, and the judgment of the circuit court must be and is reversed and judgment rendered here for the defendant."

The case law is so thoroughly reviewed in the Hedrick case, that a reading thereof will suffice as to the Missouri rule.

Now, reverting to the case at bar. Plaintiff knew that he was going to ride upon "Racer Dips" in an open car. He saw the car. Long before he got to the place of accident he knew that his course was up and down steep inclines and declines and around sharp curves. He had contracted for a pleasure ride upon a device which was open to his view, or was so open to his view in the greater part. No negligent act of

the defendant is shown. No attempt is made to show that the movements of the car at the time of the injury were unusual or extraordinary movements for that particular mode of transportation. If the jerk described by Wait and by Hedrick were not sufficient in these cases to show an unusual happening in that mode of transportation, how can it be said that the faint slackening of the car and the increase of speed of the car, and the "wiggles" of the car, described in this case, can be held to be evidence of an unusual occurrence in this mode of transportation? So, we say that upon the theory of passenger and carrier, the demurrer to this evidence was properly sustained, and the judgment of the court *nisi* should be affirmed.

V. Personally, I do not believe the case is one of passenger and carrier. We, as a court, are not more ignorant than the general public. What is generally known, we must know. We know that there are a great number of pleasure devices, the objects and purposes of which are to furnish sensational experiences for pleasure seekers. The scenic railways with all their variations; the circular swings with all their variations; toboggan slides, etc. They are not common carriers of passengers in any sense of the word. Nor do we believe the doctrine *res ipsa loquitur,* as applied to common carriers, has application here, but as said in the Maryland case, supra, in the quotation we have made, the doctrine may be said to apply to at least two classes of cases, which are described therein, and the latter class described in the Maryland case may cover those devices, and the doctrine *res ipsa loquitur* be invoked upon a proper state of facts; but those facts are not in this record.

The cases holding that the parties in cases of this kind bear the relation of carrier and passenger are O'Callaghan v. Dellwood Park Co., 242 Ill. 336, and cases citing and following that case. This question, however, goes only to the measure of care, and there are several cases which take a different view as to the

relationship of the parties. In the view we have taken of the facts in this case, under the assumption that the relationship did exist, this question is largely a moot one now. The judgment *nisi* should be affirmed. It is so ordered.

*Woodson, C. J.,* and *Revelle, J.,* concur; *Faris, J.,* concurs in result and all of opinion except paragraph five; *Bond, Walker,* and *Blair, JJ.,* dissent in opinion by *Bond, J.*

BOND, J. (dissenting).—The following opinion written by me in Division, with a few additions, is now filed as my dissent from the opinion adopted by the majority of this court.

Plaintiff sued the defendant for twenty-five thousand dollars for injuries sustained while riding on a scenic railway called the ''Racer Dip,'' operated by defendant for the transportation of persons for hire over and around double metal tracks supported by trestles and proceeding over very steep high and low grades so as to return on a circuitous course, after a trip of about three-quarters of a mile, to the starting station. These tracks are situated in Forest Park Highlands, an amusement resort in St. Louis.

The cause of action stated by the plaintiff is, to-wit:

''Plaintiff further states that on or about the 8th day of May, 1910, for a valuable consideration paid defendant, they received the plaintiff into one of their conveyances or cars aforesaid, for the purpose of conveying him therein as a passenger on and around the 'racer dip' aforesaid.

''That said 'racer dip,' the cars and track thereon were so faulty and so defectively constructed and defendants so negligently and carelessly maintained and operated the same that by reason thereof the car in which plaintiff was a passenger as aforesaid vibrated and shook so that the plaintiff was thrown with much force against the back of the conveyance or car in which he had passage, and plaintiff's right foot and leg were suddenly and violently thrown upwards and out

of said conveyance or car, thereby causing his said right foot and leg to be caught in and thrown upon and against railings, posts and uprights along and outside of said conveyance or car, through which plaintiff was greatly and permanently injured," etc.

This pleading was either a statement of general negligence in the construction and operation of the "car and track" in their entirety, as would seem clearly to be the case under the examples and definitions of general negligence contained in the following cases: Stauffer v. Railroad, 243 Mo. l. c. 325, 326; MacDonald v. Railroad, 219 Mo. l. c. 487; Briscoe v. Railroad, 222 Mo. l. c. 113, and cases cited; or it constituted an allegation of *specific* negligence as is suggested in the majority opinion. If it be construed as a mere joinder of general allegations of negligence in the construction and operation of defendant's railway, then it stands admitted, and such is the universal law, that the case made by the plaintiff entitled him to go to the jury. On the other hand, if the theory of the learned majority opinion is correct, that the foregoing allegations constituted only averments of particular and specific negligence (which I do not concede) then the case should have gone to the jury upon the phase of the evidence presented by the testimony of plaintiff and his companion. This case presents those two alternatives, for there can be no doubt, either upon reason or authority, that the defendant owning and operating the scenic railway for the transportation of the general public for hire was engaged in a calling essentially the same as that of a common carrier of persons. [Van Hoefen v. Taxicab Co., 179 Mo. App. 600; O'Callaghan v. Dellwood Park Co., 242 Ill. l. c. 343, 345; Tenn. State Fair Assn. v. Hartman, 183 S. W. 735; Best Park & Amusement Co. v. Rollins, 68 So. 417; Chesapeake Beach Ry. Co. v. Brez, 39 App. D. C. 58.]

Hence the only question is whether *any* phase of the evidence adduced by plaintiff tended to make a case to which the doctrine of *res ipsa loquitur* would be appli-

*(margin note: General or Specific Negligence: Requisite Proof.)*

cable under the theory that the allegations of negligence in the petition were general, or to show a state of facts giving rise to a reasonable inference of negligence on the part of the defendant in the construction and operation of its cars and track, upon the theory that the petition charged specific negligence in that respect. The testimony of the plaintiff as to the occurrence of the injury is, to-wit:

"Q. What sort of a track is there on the racer dip? A. There is two tracks.

"Q. Is it a level track? A. Part of the way it is level and part it is inclines and steep hills and short turns.

"Q. Louder, please. A. Inclines and steep hills and short curves and semi-circles.

"Q. Well, you say you had passage on one of these trains on the eighth of May, 1910? A. Yes, sir.

"Q. Now, will you tell the jury if you had any accident there and how it happened? A. I was sitting in one of these cars and sitting on the right side and it started out on the run and got very near all way around and the car slackened speed and threw me forward and started up all of a sudden and threw me backward and shot up that way (indicating) and threw me to one side and threw my right foot out and caught my leg.

"Q. When your foot was thrown out, what happened to it? A. It was caught against posts or uprights or rails and alongside the track where the car was.

"Q. Now, then, did it injure your foot or leg? A. It broke my right leg about an inch and a half above the ankle and threw the leg out of place, and tore all the flesh off my leg and broke it off right up about here (indicating) and twisted the knee.

"Q. Did the accident render you unconscious or not? A. Yes, sir.

"Q. How long were you unconscious? A. Why, right after the accident I became unconscious and I didn't know anything until Monday evening—until the following evening."

Plaintiff also testified that he sat in the second seat in the second car; that there was no rail or bar to which he could hold, adding further: "Only this little dashboard or something there in front that you could hold to, but there wasn't anything that you could reach your hands out to that we could hold on to;" that the train was sent out with no attendant and carried four passengers on that trip; that he had never ridden on one before and that he received no information from the defendant or his employees of the condition of the track or its sharp curves or steep grades, or that it was unprotected on the sides, nor of the jerking of the train, nor the danger of a ride thereon; that he paid a fare of ten cents for his passage; that at the place of the accident the car was slanting a little over to the side where plaintiff sat.

Plaintiff's companion on the trip testified, to-wit: "Q. Will you state just how he was injured? A. Yes, sir. We was on the last curve coming in and the car was running at a high speed and the car slacked up, kind of, and he was throwed up forward and the car started up at a pretty high speed again, which naturally turned him back and his right foot fell between the car and the railing, the outside railing.

"Q. Between what track? A. The railing.

"Q. Did it catch on anything on the outside? A. When the car kind of wiggled, it caught his foot.

"Q. What do you mean, 'wiggled?' A. Well, (indicating) kind of shaked from one side to the other.

"Q. Was that shaking more violent than at any other point in the ride around the dip? . . . A. The shaking was more in the last curve than at any place on the dip.

"Q. What effect, if anything, did this decreasing of the speed and then starting of the car, as you state, have on you? A. Why it threw me back, but I was just lucky enough to catch my hold there or it would have threw me—I was lucky enough to catch my hold to keep from getting thrown out of the car; then I

grabbed Mr. Pointer's arm and tried to prevent him from getting hurt, but it was too late.

"Q. What curve were you approaching on it at the time of the accident? A. It was on the last curve; going in on the last curve.

"Q. Sir? A. It was on the last curve; going in on the last run.

"Q. Have you, since that time, ridden on the racer dip? A. Yes, sir; I have.

"Q. Did it decrease and increase the speed in the manner in which you state it did so on the occasion when Pointer was injured. . . . A. Yes, sir; and it looks like they had the speed more under control afterwards.

"Q. What would you say caused Pointer to be thrown; his foot to be thrown out of the car? . . . A. Why, the rate of high speed, and then the sudden stop. The sudden slow-down in the speed and the start-up right quick, which naturally throwed him back and threw his foot out of the car."

The elevation of the track and its propulsive powers were these: The trains were started on their journey by being hauled up an angle of seventy-five degrees by means of an electric-power cable. When they reached this summit the physical force was released and the trains were carried thence by gravity and the momentum acquired by the sharp descent from the point where the electric force had been released. After the trains left the highest point to which they were carried by electric power, they started over a course of rapid descents and ascents and around sharp curves. The angles of the succeeding grades ranged from forty-five to sixty degrees and the trains are run "at a very high rate of speed."

The defendant's secretary testified that he could not tell what speed it was, although it took about four minutes from the time the train started to get to the returning point. He also testified that the scenic railway was opened on the twenty-third of April and that its operation was delayed a few days on account of the snow,

and that the accident occurred on the eighth of May. This was the substance of his testimony.

It is apparent if the version of the occurrence given for the plaintiff is to be accepted as true, that he had become a passenger upon a train without any warning whatever of the care and the prudence necessary to be observed to render the trip safe and was seated in a car which was not furnished with any handholds which he might seize in order to withstand the shock of a sharp descent or a whirl around a curve and which ran so near the uprights or posts supporting a structure of the side that, when the train reached its last ascent and began to descend from it on a sharp curve at a high rate of speed, he was thrown first forward and then backward by a sudden jerk so powerful as to throw his foot outside the car and cause his leg to be struck by the upright or post which supported the horizontal guard on which the side wheels of the train ran.

As to the force and suddenness of the jerk, the testimony of the companion is that it was so great as to cause the injury as described in plaintiff's testimony, and to prevent him from catching hold of plaintiff in time to save him from injury.

There can be only two ways of looking at such a jar or sudden jerk of the train, which are: First, that it was an ordinary occurrence, or second, an extraordinary and unusual happening. If it were the former, then it constituted a sufficient basis for a rational inference of *defective construction* of the car, in that it was not provided with a handhold nor sufficiently elevated at its sides, or that it ran too close to the outside posts and that such imperfections implied negligence on the part of defendant in providing cars and tracks of such a character as to inflict injury upon passengers in their normal operation. Hence upon the theory that the petition alleged specific negligence as to the construction and operation of its railway, the plaintiff did

*[margin note: Usual and Extraordinary Occurrences.]*

make a case from which the jury were entitled to infer the very specific negligence averred.

If, however, we take the other view that the jerk or jar was an extraordinary event of such force and suddenness as to cause the injury to plaintiff, then proof of that fact would necessarily call into play the rule of *res ipsa loquitur*, which is that where the thing causing the injury is under the exclusive control of one who owes a duty to another, and it is shown that the injury would not have occurred in the ordinary course of things if the agency inflicting it had been managed or operated with due care, then evidence of the happening of the injury, without the fault of the person injured, affords prima-facie evidence of negligence and will take the case to the jury and permit it to infer negligence, and then find from all the evidence whether this inference has been rebutted or overcome and the plaintiff has sustained the burden of proof imposed on him by law. This rule has been applied to injuries caused by railroads, elevators, electric wires and divers other appliances involving the use of powerful forces or machinery. [4 Wigmore on Evidence, sec. 2509, and cases cited in note; 5 R. C. L., sec. 713, p. 74; 29 Cyc. 591, and cases cited; Sweeney v. Erving, 228 U. S. 233; Brown v. Railroad, 256 Mo. 522; Dougherty v. Railway, 81 Mo. 325; Gallagher v. Illuminating Co., 72 Mo. App. 579; O'Callaghan v. Dellwood Park Co., 242 Ill. 336, 149 Ill. App. 34; Redmon v. Railway, 185 Mo. l. c. 10; Price v. Met. St. Ry. Co., 220 Mo. l. c. 457; Whittaker's Smith on Neg., p. 552; Turner v. Haar, 114 Mo. l. c. 346-7; Hughes v. Railroad, L. R. A. 1916A, 927, and notes, p. 930 et seq.]

It follows that whether the allegations of the petition be construed as a charge of general or specific negligence, in either event under the undisputed testimony the plaintiff made a case entitling him to go to the jury, for the phase of the evidence above quoted tended to prove, as has been seen, the charge of defective construction and operation (which the majority opinion holds was a specific one) or it tends to show a state

of facts invoking the rule of *res ipsa loquitur* if, as I think, the charges of negligence in the petition were general.

In these circumstances it was the duty of the defendant to rebut the prima-facie case made by the evidence given for the plaintiff on one or the other theories of negligence alleged in his petition. Defendant took no steps to rebut the weight of the evidence against it at the conclusion of plaintiff's case but interposed a general demurrer thereto which should have been overruled and the case sent to the jury.

*Walker* and *Blair, JJ.,* concur.