## HAWK *v.* WIL-MAR, INC.

[No. 199, October Term, 1955.]

*Decided June 18, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Thomas Ward* and *Paul F. Due* for the appellant.

*Thomas G. Andrew,* with whom were *Rollins, Smalkin, Weston & Andrew* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

From a judgment for the defendant, entered when the plaintiff closed in a personal injury case, the plaintiff appeals, assigning as error the directing of the verdict and refusal to compel production before trial of the statement of a witness.

In July, 1951, appellant Pauline Hawk, then fifteen years old, and another girl went to Tolchester. After lunch they patronized the amusements, including the roller coaster. Then, the day being hot and sunny, they went to the beach where they stayed until about seven o'clock. After supper the two girls went on the roller coaster with two boys they had met on the beach. The girls sat on the front seat of the roller coaster car and the boys sat behind them. The roller coaster at Tolchester is called the Whirlpool Dip and it operates in the customary way. The cars are carried to the top by a moving chain and then turned over to the force of gravity, going down a steep grade and then up an incline, the top of which is enough lower than the preceding peak to permit the cars to continue, and so on. There are several downgrades and upgrades with curves in between. As one witness described it: "The roller coaster went up the hill and around in a circle twice and then went down the hill, and at the bottom of the hill it hit a dip and it throws your body back towards the back of the car and goes up the hill and makes a sharp turn to the left, throwing your body to the right." The appellant testified that when the car hit the dip, she was thrown back and she remembers nothing after that. The other witnesses testified that after the car went around the curve to the left, they noticed appellant flying from the car. She landed on a shack below, her head going partially through the roof, and was seriously injured. Although the appellant herself had not noticed it, there was testimony from her mother, who saw the car the next day, and from the girl who was riding with her, that there was a slit or tear in the upholstery in the back of the seat in which

the appellant was riding, directly behind her, and that you could see wood through the slit in the material.

The appellant's theory of liability is that the car was permitted to be used with the slit or tear in the upholstery so that the function of the upholstery of protecting riders from jerks and jolts was defeated, that when the appellant was thrown back at the bottom of the incline, she struck her head on the unprotected wood and was knocked unconscious, and caused to be thrown from the car as, with a violent jerk, it rounded the curve at the top of the incline. Appellant urges us to apply what she says is the generally accepted rule of law that the operator of a roller coaster is held to the same degree of responsibility in the management of the apparatus as is a common carrier, the highest degree of care, and relies on a number of cases which so hold, including *O'Callaghan v. Dellwood Park Company* (Ill.), 89 N. E. 1005; *Best Park & Amusement Co. v. Rollins* (Ala.), 68 So. 417; *Bibeau v. Fred W. Pearce Corp.* (Minn.), 217 N. W. 374, among others.

This Court has indicated it does not regard the proper rule to be that urged by the appellant. In *Carlin v. Krout,* 142 Md. 140, the claimant was injured on an amusement device known as the ocean wave, having caught her arm between two overlapping hand rails of different sections of the device, and it was held there was no evidence of negligence to go to the jury. Judge Urner for the Court distinguished the case of *O'Callaghan v. Dellwood Park Company, supra,* which is relied on strongly by the appellant in the case before us as supporting the highest degree of care rule, and cited as in point and persuasive the case of *Pointer v. Mountain Ry. Construction Co.* (Mo.), 189 S. W. 805. There the claimant, riding on a scenic railway, was thrown against uprights beside the track as the car rounded a sharp curve, and it was noted that the Missouri Court had held that there was no showing of negligence since no defect in the car or track and nothing unusual in the behavior of the car at the time of the accident had been testified to, and the claimant was aware of the conditions under which this form of amusement was

available. The case of *Lumsden v. Scenic Railway,* 114 N.
Y. S. 421, was cited as reaching the same result on the same
reasoning. Judge Urner then stated the rule to be that a pro-
prietor of a place of public amusement is under obligation to
use ordinary care and diligence to keep the place in a
reasonably safe condition for use by persons attending. He
is not an insurer of the safety of persons using devices at
the place of amusement but is bound to use ordinary care for
their safety and protection and is liable for a breach of this
duty resulting in injury. In *Glaze v. Benson,* 205 Md. 26,
33, it was said: "The courts have held that an operator of
a place of amusement, to which the public is invited, dis-
charges his obligation if he maintains his facilities in a rea-
sonably safe condition for the purposes for which they are
apparently designed and for which they are adapted."

There is no evidence in the case before us to show that
the roller coaster was not in its ordinary condition or that
there was anything wrong with the track or the car, except
the slit in the upholstery and some looseness of the bar pro-
vided for riders to hold on to. It is not shown that the
journey of the car during which the accident happened was
an unusual one, or that the jerk at the bottom of the incline
or the jerk going around the curve to the left was unusual,
either for that roller coaster or in relation to those prevail-
ing on roller coasters generally. The appellant herself said
that she had ridden on roller coasters before and had rid-
den on this particular one earlier in the day so that she knew
what to expect. One of the boys who was riding in the
seat behind the appellant was asked whether anything un-
usual happens when the car reaches the bottom before it goes
up the hill to where appellant was thrown out. His answer
was: "Well, it's not unusual. It's in any racer dip that you
ride in. It does throw you back from momentum." He
was asked if anything unusual happens when the car reaches
the top, and he said: "Well, not at the top but on further
there is an awful jolt, you hit a sharp turn that gives you a
right good jolt." When asked to describe that jolt, he an-
swered: "Well, the only thing I can say is when we hit that

curve it kind of jolts you a little further and to your right hand side. You would go a little to the right hand side due to the momentum." On cross-examination, he said he had ridden this particular roller coaster at least five hundred times, that all roller coasters, and this particular one, involve a certain amount of jolts and jerks, which are part of the fun of the ride. He said that the jolts and jerks which he had testified to were not unusual. He elaborated on this statement and said: "Every mountain speedway has jolts. Some have a little more than others, depending on the size, so I would say as a mountain speedway it has its normal jolts and jars." When asked about the curve where the accident happened and whether there was an unusual jerk at the time of the accident, he said: "A roller coaster has unusual jerks, which is normal. That's the fun of riding it. * * * It was a jolt like it always had."

There was no testimony showing, or permitting an inference other than speculative, that the operation of the device at the time of the accident was not as it always was, and as was to be expected. Likewise, there is nothing that rises above speculation to show what caused the appellant to become unconscious, if she did, before she was thrown from the car. The testimony as to the slit or tear in the upholstery leaves it entirely uncertain whether the boards that were visible could be struck by one's head or whether the upholstery, despite the tear, would still have prevented this. The trial court, in ruling on the directed verdict, said that the evidence in the case showed that the top of the back of the seat was shoulder high on the appellant. There is no evidence that the appellant hit her head on anything, much less an exposed board. There is nothing to indicate that the play in the handle bar had anything to do with the happening of the accident. We think that on the failure to show negligence, the case is not to be distinguished from *Carlin v. Krout, supra,* and, more particularly not from *Benedick v. Potts,* 88 Md. 52. There the claimant was riding a mimic railway at Tolchester Beach, similar in operation to that in the present case. That railway had a tunnel through which the cars

passed. The roof of the tunnel was flat, and down its center ran a narrow board two and a half to three inches wide. The claimant was in the car when it entered the tunnel but was not when it came out. He was found unconscious inside the tunnel with a wound on his head. It was shown that a part of the board running down the center of the tunnel roof had been slabbed off at one point. The car did not leave the track. No part of it was shown to be out of repair and there was no evidence to show that the track was defective, and no precise explanation was given as to what caused the injury. The trial court found for the defendant and this Court affirmed. Judge McSherry said for the Court that this was not a case of *res ipsa loquitur,* pointing out: "Until you know *what* did occasion an injury, you cannot say that the defendant was guilty of some negligence that produced that injury. There is, therefore, a difference between inferring as a conclusion of fact *what* it was that did the injury; and inferring from a known or proven act occasioning the injury that there was negligence in the act that did produce the injury. * * * In no case where the thing which occasioned the injury is unknown has it ever been held that the maxim applies; because when the thing which produced the injury is unknown it cannot be said to speak or to indicate the existence of causative negligence." In the case before us the appellant, from all that is known, may have fainted because of the swift descent and abrupt change of momentum following a recent meal and a day in the hot sun, or the jerk at the bottom of the incline may have caused a snap of the neck which, in turn, caused unconsciousness; she may have been skylarking and not holding on to the bar provided for that purpose and not have lost consciousness at all, failing to remember what happened because of the blow to her head when she struck the roof below.

The cases relied on by the appellant, in addition to imposing the highest standard of care on the operators of the scenic railways, all involved factual situations where there was evidence of tangible defects in car, track or operation. In one case the car in which the claimant was riding hit

another car; in a second case the car unexpectedly came to a very sudden stop, indicating a defect in the track; in a third, the testimony was that the jerk or jolt which caused the injury was an unusually violent one such as had never before been experienced. None of those factors is involved in the case we are deciding. We think the trial court rightly directed a verdict for the appellee.

The appellant, by interrogatories, secured the names of all of the witnesses to the accident so far as was known to the appellee, and the names of those who had given signed or written statements. She then filed a petition pursuant to General Rules of Practice and Procedure, Discovery Rule 4, asking for the production of all statements of witnesses "* * * which have been reduced to writing concerning any incident or occurrence referred to in the Declaration." The petition was based on the ground that the witnesses could no longer accurately remember what they said in the statements given because three years had passed "and that the contents of these statements are necessary for the proper preparation of the plaintiff's case." The petition was filed on November 12, 1954. A hearing on it was held several weeks later and then continued for several more weeks. On December 6, counsel for the appellant made and filed an affidavit in support of the petition, in which he swore that the statements of the witnesses "* * * contain information which is vital to the proper presentation of his case, and that without knowledge of the contents of the statements which the above named persons made, he cannot properly prepare his case." Finally, the affiant alleged that one of the witnesses giving a statement was William L. Simms, who was an employee of the appellee at the time of the accident and a witness to the accident "And this witness has died since the accident occurred * * *." The affiant concludes by alleging that all of the witnesses were eye observers of the accident and that the "materials contained in their statements are vital to the proper preparation of the Plaintiff's case." At the argument, we were told that the appellant's counsel had been informed by the president of the appellee that William L. Simms was dead. Not

only did counsel for the appellant accept this as a fact but so did counsel for the appellee. Not until several days before the argument of the case in this Court did counsel for the appellee discover that there was a confusion in names and identity between a father and son. The person who was dead was the father, while the witness who gave the statement was his son, whose name also was William L. Simms but who always was known as and called Leslie Simms. There is no doubt that an honest mistake deceived counsel for both sides.

Appellant now has abandoned claim of error in denying her the statements of all witnesses other than William L.—Leslie—Simms. She does say she was entitled to see the Simms statement because of the allegation that its maker was dead. It is not necessary, therefore, for us to pass on whether the general allegations as to the importance of the statement of the witnesses to the appellant's case were sufficient to constitute a showing of the "good cause" which Discovery Rule 4 makes a prerequisite to the right to demand production. There is substantial authority that good cause is not shown by such general allegations. *Hickman v. Taylor,* 329 U. S. 495, 91 L. Ed. 451; *Hudalla v. Chicago, M., S. P. & P. R. Co.,* 10 F. R. D. 363; *Gebhard v. Isbrandtsen Co.,* 10 F. R. D. 119; *Martin v. Capital Transit Co.,* 170 F. 2d 811; 4 *Moore's Federal Practice,* 2d Ed., Para. 26:23 (8) and Para. 34:08. It was conceded by the appellant at the argument that she would not have been entitled to production of the statement if it had been known that Simms were living, since good cause is not shown if a witness is available to the one seeking production of his statement and his knowledge of the facts of the occurrence can be secured by deposition or interview. The passages of *Moore's Federal Practice,* which we have cited above, make this plain, as did the Supreme Court in *Hickman v. Taylor, supra,* and as do *Hoffman v. Chesapeake & Ohio R. Co.,* 7 F. R. D. 574; *Silvetti v. United States,* 8 F. R. D. 558; *Gordon v. Pa. R. R. Co.,* 5 F. R. D. 510, 512; *Berger v. Central Vermont Ry., Inc.,* 8 F. R. D. 419; *State of Maryland, for Use of Montvila v. Pan-Amer. Bus Lines, Inc.,* 1 F. R. D. 213 (Judge Chesnut in

the Dist. Ct. for the District of Maryland) ; *Hallman v. Gross,* 190 Md. 563. We assume, without deciding, that if Simms had in fact been dead, the appellant would have been entitled to the production of his statement. *Hickman v. Taylor, supra;* 4 *Moore's Federal Practice,* sections cited; *Brown v. New York, N. H. & Htfd. R.,* 17 F. R. D. 324; *Burns v. Phila. Transp. Co.,* 113 F. Supp. 48. Judge Warnken so held in *Gryglik v. Baltimore Transit Co., et al.,* in an opinion reported in The Daily Record of June 6, 1955, saying that as the witness was deceased, the plaintiff should be allowed to see and copy his statement as "It may contain information or leads to other sources of relevant testimony." We have consistently held that the Discovery Rules should be liberally construed to effectuate their purpose—*Hallman v. Gross, supra; Barnes v. Lednum,* 197 Md. 398, 406—and where, as in the case of death or other real unavailability of a witness, the 'most diligent efforts could not obtain either the knowledge that the missing witness had or leads from what he knew, we assume, although it is not necessary for us to decide the point, that the statements of such a missing witness should be made available to the other side.

The appellant finds herself in this anomalous situation. She urges that the case be reversed for the failure of the court to require the giving of a statement to which she was not, in fact, then entitled and to which she would not be entitled if the case were remanded, since the witness Simms has always been, and now is, available for deposition or interview. Nevertheless, she urges that we reverse the judgment and send the case back for a new trial, contending that if she had known the true facts, she would have been able to secure the information that Simms gave in his statement and other facts to which she would have been led, and that her ability to effectively present her case would have been far greater. We permitted the appellee to file a photostatic copy of Simms' statement with the Court. Rules of the Court of Appeals—Rule 37. It is very short and its gist is that as he was standing on the ground, he saw an object leave a car on the scenic railway and thought it was a coat. When it was

about halfway down, he realized it was a body. He directed the operator not to send up another car. He reported the accident and then helped to put the girl on a stretcher. Even if the trial court were considered to have abused its discretion in refusing production of Simms' statement, under the facts as they then appeared so that it would be proper for us to reverse—*Barnes v. Lednum, supra*—we think there was no prejudicial error in its action. We find nothing in Simms' statement to indicate that had the appellant or her counsel seen it before trial and had interviewed its maker, she would have been able to produce evidence which would have changed the result. We will not reverse a case unless the error complained of was prejudicial. *Adams v. Benson,* 208 Md. 261.

*Judgment affirmed, with costs.*